2022 UT 29

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LOIS SMITH,
*Appellant & Cross Appellee,*

*v.*

VOLKSWAGEN SOUTHTOWNE, INC.,
*Appellee & Cross Appellant.*

No. 20190382
Heard February 10, 2021
Filed June 30, 2022

On Direct Appeal

Third District, Salt Lake
The Honorable Barry G. Lawrence
No. 130908362

Attorneys:[1]

Michael A. Worel, Colin King, Ricky Shelton, Paul M. Simmons,
Salt Lake City, for appellant and cross appellee

Rodney R. Parker, Nathanael J. Mitchell, Salt Lake City,
for appellee and cross appellant

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE HIMONAS,[*] and JUSTICE PEARCE joined.

JUSTICE HAGEN became a member of the Court on May 18, 2022,
after oral argument in this matter, and accordingly did not
participate.

---

[1] Attorneys for *amici curiae*: S. Spencer Brown, Axel Trumbo, Scarlet R. Smith, Salt Lake City, for Utah Defense Lawyers Association; Tracy H. Fowler, Salt Lake City, Alan J. Lazarus, San Francisco, CA, for Product Liability Advisory Council, Inc.

[*] Justice Himonas sat on this case and voted prior to his retirement on March 1, 2022.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1   Volkswagen SouthTowne (SouthTowne) sold Lois Smith a vehicle that was subject to a safety recall because of a defective fuel injection line. Shortly after buying the car, Smith drove it to Washington State to visit family. During the drive, she began smelling fumes and feeling sick. After seeing smoke coming from under the hood, she had the car towed to a Volkswagen dealership along the way. A mechanic found that the safety recall had not been performed on Smith's vehicle, and he observed that a cracked fuel line had sprayed diesel fuel throughout the engine compartment. Smith was later diagnosed with carbon monoxide poisoning. She filed negligence and strict liability claims against SouthTowne and other Volkswagen entities.

¶2   Smith prevailed at trial and the jury awarded her $2,700,000 in damages. SouthTowne then moved for judgment as a matter of law and a new trial. The district court granted SouthTowne's motions because it concluded Smith had failed to prove causation.

¶3   Smith now appeals the district court's reversal of the jury verdict in her favor. And although it prevailed post-trial, SouthTowne cross appeals, asserting that the district court incorrectly rejected some of the arguments it advanced in its post-trial motions.[2] It also challenges some of the district court's

---

[2] As the prevailing party, it is not clear that all the arguments SouthTowne advances in its cross appeal should have been brought in that manner. Generally, if an appellee wishes to argue that the district court's ruling should be upheld for reasons other than those relied upon by the district court, but the appellee is not seeking to challenge the results of the judgment or to enlarge its rights or lessen the rights of its opponent in some way, then an appellee should present such arguments as alternative grounds for affirmance in its response brief rather than in a separate cross appeal. *See State v. South*, 924 P.2d 354, 355–57 (Utah 1996) (adopting the "*Langnes* doctrine" and holding that a cross appeal is necessary only where there exists a challenge to the tangible result of a judgment or decision); *Helf v. Chevron U.S.A. Inc.*, 2015 UT 81, ¶¶ 61–63, 361 P.3d 63 (finding a cross appeal inappropriate where the appellee sought an affirmance of the

(continued . . .)

evidentiary rulings, in the event that there is a new trial.

¶4    We reverse in part and affirm in part. We disagree with the district court's conclusion that Smith failed to prove the defective fuel injection line caused her to suffer carbon monoxide poisoning. But we affirm the district court's rulings rejecting the arguments SouthTowne attempts to revive in its cross appeal. Accordingly, we conclude that SouthTowne is not entitled to judgment as a matter of law or a new trial, and we order the jury's verdict to be reinstated.

## BACKGROUND[3]

¶5    In October 2011, Volkswagen's corporate office sent a "Mandatory Stop Sale Order" and "Safety Recall" to all of its dealerships, including SouthTowne. In the order, Volkswagen Corporate warned SouthTowne that certain Volkswagen cars had a defective fuel-injection line that could crack during operation and spray high-pressured fuel on the engine. Volkswagen ordered SouthTowne, "effective immediately," to quarantine the defective cars "in a secure area where [they could not] be made available for sale, lease, trade, or demo use until the recall repair ha[d] been performed."

¶6    But one month later, SouthTowne sold one of the defective cars to Lois Smith. In December 2011, a few weeks after purchasing the defective Volkswagen, Smith drove the car from

---

district court's judgment on alternative grounds, and did not seek to enlarge its rights or lessen the rights of its opponent under the judgment).

Smith has not challenged any of SouthTowne's cross-appeal claims as procedurally improper. So we do not analyze this matter further. We make these observations only to clarify that when a party prevails below, it should file a cross appeal only where it seeks to challenge the tangible result of a judgment or decision, s*ee South*, 924 P.2d at 355–57, or seeks to enlarge its rights or lessen the rights of its opponent under the judgment, *see Helf*, 2015 UT 81, ¶¶ 61–63.

[3] "On appeal from a trial court's entry of a judgment [as a matter of law], we view the evidence and all reasonable inferences therefrom in a light most favorable to the party who prevailed at trial." *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1061–62 (Utah 1996) (citations omitted). We recite the facts accordingly.

Salt Lake City to Washington State to visit family. At some point during this drive, Smith began smelling what she described as "a gassy smell" and an "engine smell." Smith was initially unconcerned, because her stepfather had explained upon purchase of the vehicle that cars with diesel engines always "smell bad" and had warned her that any diesel-related odor might take some time to get used to.

¶7 Soon, however, Smith began to feel "extremely sick." She developed a headache "like [she]'d never felt before," she "felt like [she] was on fire," and she was "sick to [her] stomach." Smith also became "seriously sleepy."

¶8 After experiencing these symptoms, Smith pulled off the highway for a break. She noticed "a big cloud of smoke" coming from the engine. In reaction to the smoke, Smith had the vehicle towed to the nearest Volkswagen dealership.

¶9 At the dealership, a Volkswagen mechanic named Guadalupe Mejia discovered a defective fuel line. Mejia also observed that fuel had sprayed throughout the engine compartment. He observed somewhere "between . . . a pint and a quart" of fuel on various parts of the engine, including where the engine houses the exhaust manifold and turbocharger, and another "foot in diameter" of diesel fuel pooled underneath the car.

¶10 Smith stayed in a motel for a few days as she waited for the dealership to repair her vehicle. During this time, she continued to feel symptoms similar to those she had experienced while driving her vehicle. She "just wanted to [] sleep" and "didn't care about eat[ing]." Apart from attending church, during which she fell asleep more than once, Smith could recall getting up only once while awaiting the repairs.

¶11 Because her symptoms persisted, Smith eventually went to an emergency room after arriving in Washington. Although the E.R. doctor could not detect any lingering or concerning traces of carbon monoxide in Smith's blood, the doctor presumed, based on her symptoms and description of events, that Smith had suffered carbon monoxide poisoning. The doctor also treated her for an upper respiratory infection.

¶12 After Smith returned to Utah, her friends and co-workers noticed significant changes in her behavior. Smith's employer observed that she was having unprecedented problems with her speech, memory, job performance, writing, and ability to connect

with others. According to one supervisor, it was "like somebody switched the switch and turned off the light" inside her.

¶13 Shortly after her return from Washington, Smith visited the clinic of her primary-care physician. The clinic noted that Smith was having "difficulty talking" and that her "words [were] jumbled and slurred." Clinic notes also indicated that Smith was "having a difficult time concentrating," had a "headache on the left side of her head," and felt tired. And another physician noted that Smith was having "problems with word-finding and speech."

¶14 Smith visited a specialist in October 2012, just under a year after her trip. This specialist, neurologist Dr. John Foley, noted a "history of presumed carbon monoxide intoxication" from the year before. And based on Smith's reported history, he performed a neurological exam. Smith failed two of the tests. Dr. Foley's findings noted "[p]robable carbon monoxide intoxication with subsequent residual neurological dysfunction," as well as "ongoing affective disorder, cognitive dysfunction, fatigue and decreased balance." He recommended "[f]urther neurological work-up, including [an] MRI of the brain."

¶15 One year after this first consultation, in November 2013, Smith visited another specialist in carbon monoxide poisoning, Dr. William Orrison. After ordering an MRI and reviewing the scans of Smith's brain, Dr. Orrison noted that Smith had suffered brain damage "consistent with . . . the clinical history of carbon-monoxide exposure."

*Pre-Trial Litigation*

¶16 Due to her injuries, Smith filed negligence and strict liability claims against Volkswagen AG, Volkswagen Group of America, Volkswagen de Mexico, and Volkswagen SouthTowne.[4] During the litigation, Smith retained several experts.

¶17 One of these experts was Peter Leiss. Leiss was to opine on two issues: (1) whether carbon monoxide could be generated by the alleged diesel fuel leak; and (2) if so, whether there was a passageway for the carbon monoxide to travel from the engine compartment into the passenger compartment. Leiss was a mechanical engineer with twenty years of experience in the

_____

[4] Volkswagen AG, Volkswagen Group of America, and Volkswagen de Mexico were voluntarily dismissed from the case during trial.

automotive industry, including with diesel engine vehicles and diesel fuel systems. He had no independent training in chemical engineering.

¶18  To form an opinion regarding whether carbon monoxide could have been produced by the diesel fuel leak in Smith's car, Leiss relied on a test conducted by a lab technician he worked with at Robson Forensics—a firm that employs about "a hundred full-time experts." The technician dropped two milliliters of diesel fuel onto a hot metal plate inside an enclosed, upside-down glass aquarium, while measuring the amount of carbon monoxide produced in parts per million (ppm) as the temperature of the hot plate rose. When the drops of diesel fuel hit the metal surface at a heat of 344 degrees Fahrenheit, the technician detected 295 ppm of carbon monoxide.

¶19 Smith also retained Dr. Lindell Weaver, a specialist in internal medicine, pulmonary critical care, and hyperbaric medicine with expertise in carbon monoxide poisoning. Dr. Weaver was to provide medical testimony about the extent of Smith's injuries and to opine on the cause of those injuries. Dr. Weaver based his conclusions on several factors, including his own experience in the field, his knowledge of the events surrounding Smith's alleged carbon-monoxide poisoning, his own interview with and physical examination of Smith, his evaluation of her brain scans, and the report created by Dr. Orrison, who passed away before trial and was therefore unavailable to testify.

¶20 Before trial, SouthTowne filed various motions *in limine* seeking to limit or exclude testimony from Smith's experts, including Leiss and Dr. Weaver.

¶21  With regard to Leiss, SouthTowne argued that he should not be permitted to opine that carbon monoxide was created in Smith's engine compartment based on the results of the lab test because the test was conducted in an enclosed glass aquarium that lacked airflow, and therefore did not replicate the conditions under Smith's hood on the day in question. SouthTowne also argued that Leiss should not be allowed to opine on the concentration of carbon monoxide in Smith's passenger compartment. And it argued that Leiss should not be allowed to opine that the leaking fuel caused Smith to suffer carbon monoxide poisoning, because Leiss was not a medical doctor. The district court denied the motion without prejudice, stating it would "assess [Leiss's] opinions at trial" and noting that the court

had a concern about whether Leiss could "quantify the amount of [carbon monoxide] in the passenger compartment."

¶22 With regard to Dr. Weaver, SouthTowne argued in relevant part that Dr. Weaver's opinion that Smith suffered carbon monoxide poisoning during her drive should be excluded because he "appear[ed] to base" that opinion on an unreliable differential diagnosis.[5] The district court also denied this motion without prejudice, but it noted that it was concerned about Dr. Weaver's "ability to identify the source of . . . Smith's alleged [carbon monoxide] poisoning."

*Trial*

¶23 The case proceeded to trial. During her case in chief, Smith called Leiss as an expert witness. Smith offered the results of the lab test into evidence, and they were admitted without objection. Leiss explained that the test had measured 295 ppm of carbon monoxide when drops of diesel fuel hit the metal surface at a heat of 344 degrees Fahrenheit. He then testified that parts of the vehicle's engine could reach temperatures beyond 344 degrees Fahrenheit. Leiss had read the deposition of Volkswagen mechanic Mejia, who saw between a pint and a quart of diesel fuel pooled on Smith's engine, including on the turbocharger and exhaust manifold. And he testified that during driving conditions like Smith's drive to Washington, the turbocharger and exhaust manifold can reach between 500 and 700 degrees Fahrenheit. He also testified that these parts of the engine receive less air flow due to their location. On this basis, Leiss opined that the diesel fuel leaking from the defective fuel line could have produced carbon monoxide when it came in contact with these extremely hot surfaces. And he further opined that carbon monoxide created in the engine compartment could travel to the passenger compartment.

¶24 Smith also called Dr. Weaver as an expert witness. Dr. Weaver testified based on objective medical tests, such as an

_____

[5] "'Differential diagnosis' refers to the process by which a physician 'rule[s] in' all scientifically plausible causes of the plaintiff's injury . . . [and] then 'rules out' the least plausible causes of injury [,] until the most likely cause remains." *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1209 (10th Cir. 2002) (first alteration in original) (citation omitted) (internal quotation marks omitted).

MRI scan of Smith's brain, that Smith had in fact suffered carbon monoxide poisoning.[6] And after eliminating other potential causes, Dr. Weaver opined that Smith had been poisoned by carbon monoxide while driving her Volkswagen from Utah to Washington in December 2011.

¶25 In response to the expert testimony put on by Smith, SouthTowne introduced several experts at trial during its case in chief. This included two chemical engineers: Dr. Geoffrey Silcox and John Schumacher. Like Leiss, Dr. Silcox and Schumacher had conducted experiments prior to trial to determine the temperature at which diesel fuel would produce carbon monoxide in the absence of combustion. But while Leiss's test had been conducted in an enclosed space, the tests conducted by Dr. Silcox and Schumacher were intended to replicate the airflow encountered by the Volkswagen engine during Smith's drive to Washington.

¶26 At trial, Dr. Silcox testified that carbon monoxide can autogenerate at 469 degrees Fahrenheit in an enclosed space and at 869 degrees Fahrenheit on a flat surface. He also testified about the results of his test, which had introduced airflow into the equation. Dr. Silcox's test involved dropping diesel fuel onto a metal surface calibrated to various temperatures inside a five-gallon plastic bucket with a carbon-monoxide meter. Outside air was piped through the bucket with an air compressor. Dr. Silcox did not detect any carbon monoxide, but he admitted he had not tested temperatures over 480 degrees Fahrenheit because his bucket had started to melt. During cross-examination, Silcox conceded that "it's possible" for diesel fuel leaking on an engine to produce carbon monoxide.

¶27 Schumacher testified that he agreed with Dr. Silcox's testimony about the temperatures at which diesel fuel can produce carbon monoxide when heated in an enclosed space or

---

[6] We use "objective" here in the sense of "objective medical evidence" as opposed to "subjective medical evidence." For example, the Social Security Administration considers "objective medical evidence" to be "'evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption.'" *Consideration of objective medical evidence*, 3 SOC. SEC. LAW & PRAC. § 36:25 (referencing 20 C.F.R. § 404.1529(c)(2)).

on a flat surface. He also testified about the results of his test, which, like Dr. Silcox's, attempted to account for the influence of airflow. Schumacher positioned a copper tube above a metal surface, which was set to various temperatures, to capture vapor produced when he dropped diesel fuel onto the surface. The distance between the copper tube and the metal surface was meant to replicate airflow into the car's engine compartment. A carbon monoxide meter at the top of the cylinder detected carbon monoxide when the surface was calibrated to 657 degrees Fahrenheit.

¶28 SouthTowne also offered the expert testimony of Detlef Kuehn, a mechanical engineer who specialized in automotive engineering, and who worked at Volkswagen AG as a test engineer in the vehicle safety department. Before trial, Kuehn had done field testing to measure engine temperatures of a similar model Volkswagen under various driving conditions, including five minutes of "full blast" driving. After the "full blast" driving, he found that the hottest engine temperature was on the turbocharger, which reached 653 degrees Fahrenheit.

¶29 Following an eight-day trial, the jury returned a verdict in Smith's favor on both her negligence and strict liability claims. The jury awarded Smith a total of $2,700,000 in non-economic damages. SouthTowne subsequently filed three motions under the Utah Rules of Civil Procedure seeking to overturn the jury's verdict: (1) a rule 50 motion for judgment notwithstanding the verdict,[7] (2) a rule 59 motion for a new trial, and (3) a motion for relief from judgment under rule 60(b).

*Rulings on SouthTowne's Post-Trial Motions*

¶30 After holding oral argument, the district court granted SouthTowne's motion for judgment as a matter of law because it concluded Smith had provided legally insufficient evidence on the element of causation. In its ruling, the district court rejected an

---

[7] Rule 50 was amended in 2016 to change the terms "directed verdict" and "judgment notwithstanding the verdict" to "judgment as a matter of law." *Arnold v. Grigsby*, 2018 UT 14, ¶ 10 n.2, 417 P.3d 606 (discussing UTAH. R. CIV. P. 50). This change had no substantive effect on the existing standard. *Id.* We use the updated term "judgment as a matter of law," but we employ "directed verdict" and "judgment notwithstanding the verdict" when quoting other sources that use those older terms.

argument advanced by SouthTowne that Smith had failed to sufficiently establish the applicable standard of care.

¶31 The court also conditionally granted SouthTowne's motion for a new trial because it determined that two of Smith's experts, Leiss and Dr. Weaver, provided testimony that it should have excluded.[8] Specifically, the court concluded that the laboratory test relied upon by Leiss was unreliable because it was performed by a lab technician that the court believed to be unknown, and Leiss was not an expert in chemistry and therefore could not assess the reliability of the test performed by the unidentified technician. The court ruled that it would be unfair for the verdict to stand where Leiss's testimony relied upon an "obviously unreliable test," and "where [the test] was the only evidence supporting the creation of [carbon monoxide]."

¶32 The court also concluded that it should not have admitted Dr. Weaver's opinion testimony that Smith was poisoned by carbon monoxide during her drive to Washington. The court believed Dr. Weaver had failed to consider in his differential diagnosis the fact that Smith had lived in her car for a period of time, which the court deemed to be another possible source of carbon monoxide poisoning.

¶33 In reaching its rulings regarding the testimony of Leiss and Dr. Weaver, the court rejected a number of arguments advanced by SouthTowne in support of its new trial motion. Relevant here, the court rejected SouthTowne's arguments that (1) Smith improperly relied on the deceased Dr. Orrison's MRI report and associated findings, and (2) Dr. Weaver's testimony suffered from reliability defects that rendered his differential diagnosis inadmissible.

¶34 With regard to SouthTowne's rule 60(b) motion, Smith argued that the court should deny it as untimely because

---

[8] After granting SouthTowne's motion for judgment as a matter of law, the district court conditionally ruled on SouthTowne's new trial motion in accordance with rule 50(c)(1) of the Utah Rules of Civil Procedure, which states

> If the court grants a renewed motion for judgment as a matter of law, it must also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed.

SouthTowne had filed the motion sixty-eight days after judgment was entered in the case—forty days later than required under rule 59(b). The court rejected Smith's argument and excused the late filing. But it declined to rule on the 60(b) motion at that time, concluding that an evidentiary hearing was necessary to resolve the motion.

¶35  Smith appeals all three orders. And although it prevailed in the district court, SouthTowne files a cross appeal, re-asserting arguments that the district court rejected. Specifically, SouthTowne contends that (1) the court should have granted its motion for judgment as a matter of law on the ground that Smith did not provide expert testimony on the standard of care applicable to a car dealership facing a recall campaign, and that (2) the district court should have granted its motion for a new trial on the grounds that (a) reliability defects in Dr. Weaver's differential diagnosis rendered his causation opinions inadmissible, and (b) presentation of Dr. Orrison's findings and associated imaging should not have been disclosed to the jury during testimony or otherwise.[9] For the same reasons, SouthTowne also requests that in the event of a new trial, we instruct the district court to exclude Dr. Weaver's opinions in their entirety and exclude evidence of Dr. Orrison's scans and report.

¶36 We exercise jurisdiction under Utah Code section 78A-3-102(3)(j).

**STANDARDS OF REVIEW**

¶37  This case comes to us on direct appeal from the district

_____

[9] We also received amicus briefing from the Product Liability Advisory Council, Inc. (PLAC), a non-profit professional association of corporate members representing American and international products manufacturers, and the Utah Defense Lawyers Association (UDLA). PLAC requests clarification on admissibility standards related to expert testimony in product liability and toxic tort cases, including the admissibility of expert medical causation opinions and the dose-response evidentiary foundation needed to prove medical causation in toxic tort cases. UDLA requests clarification of the proper application of admissibility determinations under Utah Rule of Evidence 702, noting confusion over advisory language in the 2007 amendment. We address these concerns below. *See infra* ¶¶ 80 n.16; 113 n.19; 131 n.22.

court. Because of the variety of issues raised by the parties, we employ multiple standards of review in this case.

¶38 Smith appeals three of the district court's post-trial orders. First, she challenges the district court's order granting SouthTowne's motion for judgment as a matter of law. We review rulings on such motions for correctness, *see ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 2013 UT 24, ¶ 18, 309 P.3d 201, and in doing so "accept as true all testimony and reasonable inferences" that support the jury's verdict. *Gold Standard, Inc. v. Getty Oil Co.*, 915 P.2d 1060, 1066 (Utah 1996).

¶39 In its cross appeal of the district court's ruling on its motion for judgment as a matter of law, SouthTowne contends the district court erred in rejecting its argument that Smith's negligence claim should not have gone to the jury because she did not present expert testimony on the standard of care applicable to an auto dealer implementing a manufacturer's recall pursuant to federal regulations. Whether expert testimony is required to establish the applicable standard of care in a particular case presents a question of law, which we review for correctness. *See Grynberg v. Questar Pipeline Co.*, 2003 UT 8, ¶ 20, 70 P.3d 1 (explaining that questions of law are reviewed for correctness).

¶40 Smith next argues that the district court erred in conditionally granting SouthTowne a new trial based on the court's conclusion that it had erroneously admitted certain expert testimony. "We apply an abuse of discretion standard in reviewing a [district court's] decision to grant or deny a new trial . . . ." *USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 30, 372 P.3d 629 (citation omitted).[10] In doing so, "[w]e review the legal standards

---

[10] In the past, we established different standards of review depending on whether the trial court denied or granted a motion for a new trial based on alleged insufficiency of evidence under Utah Rule of Civil Procedure 59(a)(6). *See Nelson v. Trujillo*, 657 P.2d 730, 731–32 (Utah 1982). In cases where the lower court denied a motion for a new trial, we affirmed the decision on appeal "if there was an evidentiary basis for the jury's decision" and reversed "only if the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust." *Id.* at 732 (citations omitted) (internal quotation marks omitted). Where the district court granted a motion for a new trial, however, we sustained the

(continued . . .)

applied by the [district] court . . . for correctness and the [district] court's factual findings for clear error." *State v. Bess*, 2019 UT 70, ¶ 17, 473 P.3d 157 (alterations in original) (citation omitted) (internal quotation marks omitted).

¶41 On cross appeal, SouthTowne contends that the district court erroneously admitted other expert testimony. "Two different standards of review apply to . . . claims regarding the admissibility of evidence."[11] *Northgate Vill. Dev., LC v. City of Orem*, 2019 UT 59, ¶ 14, 450 P.3d 1117 (citation omitted). "The first standard of review, correctness, applies to the legal questions underlying the admissibility of evidence." *Id.* (citation omitted) (internal quotation marks omitted). "The second standard of review, abuse of discretion, applies to the [district] court's decision to admit or exclude evidence . . . and to . . . determination[s] regarding the admissibility of expert testimony." *Id.* (first and second alterations in original) (citation omitted) (internal quotation marks omitted).

¶42 Finally, Smith challenges the timeliness of SouthTowne's rule 60(b) motion and argues the district court should have denied the motion on that basis. While "[w]e grant broad discretion to a [district] court['s] rule 60(b) rulings," and "accordingly review a district court's denial [or grant] of a 60(b) motion under an abuse of discretion standard," such "discretion is not unlimited." *Archuleta v. Galetka*, 2011 UT 73, ¶ 152, 267 P.3d 232 (third alteration in original) (citations omitted) (internal quotation marks omitted). "A decision premised on flawed legal conclusions, for instance, constitutes an abuse of discretion." *Lund v. Brown*,

---

decision on appeal "if the record contain[ed] substantial competent evidence which would support a verdict for the [moving party]." *Id.* (second alteration in original) (citations omitted) (internal quotation marks omitted). Neither party invoked *Nelson* as a standard of review in this case, but we take the time here to note that, in the ensuing years, *Nelson* has been overtaken by our streamlining of our standards of review. Today, the standard of review for a district court's denial *or* grant of a motion for a new trial is abuse of discretion.

[11] Our evidentiary-related standards of review also apply to SouthTowne's cross appeals regarding the testimony of Dr. Weaver and Smith's reliance at trial on the reports of the deceased Dr. Orrison.

2000 UT 75, ¶ 9, 11 P.3d 277. And while "[w]e review a district court's findings of fact under a clear error standard," we review "conclusions of law for correctness, affording the [district] court no deference." *Menzies v. Galetka*, 2006 UT 81, ¶ 55, 150 P.3d 480.

## ANALYSIS

¶43 We first address Smith's challenge to the district court's order granting judgment as a matter of law to SouthTowne, notwithstanding the jury verdict in her favor. Then we address SouthTowne's related cross appeal.

## I. ORDER GRANTING JUDGMENT AS A MATTER OF LAW

¶44 The district court granted judgment as a matter of law to SouthTowne because the court concluded that the evidence adduced at trial was legally insufficient to prove causation. Smith argues that the court erred in making this determination because it failed to consider all the causation-related evidence presented to the jury. SouthTowne defends the court's determination and, alternatively, argues that the district court should have granted its motion on the ground that Smith failed to establish the standard of care applicable to her negligence claim.

¶45 After considering all the evidence presented to the jury, we conclude that Smith provided legally sufficient evidence of both causation and the applicable standard of care. Accordingly, we reverse the district court's grant of judgment as a matter of law to SouthTowne on the basis of causation, but we affirm the court's rejection of SouthTowne's standard of care argument as an alternative reason to grant judgment in its favor on Smith's negligence claim.

¶46 Rule 50 permits a court to grant judgment as a matter of law only where "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" on a claim or defense. UTAH R. CIV. P. 50(a)(1). In addressing a rule 50 motion, "a trial court must look at the evidence and all reasonable inferences in a light most favorable to the nonmoving party." *Franklin v. Stevenson*, 1999 UT 61, ¶ 6, 987 P.2d 22. And because this type of motion "does not raise questions relating to the competency or admissibility of evidence," courts must take the evidence "as it existed at the close of the trial, and evidence admitted over objection cannot be excluded nor can evidence be included which was improperly rejected." *Id.* ¶ 7 (citation omitted). In other words, "[w]hether competent or incompetent,

*all evidence submitted to the jury must be considered by the court.*" *Id.* (citation omitted).

### A. Causation

¶47  We first address the district court's conclusion that Smith failed to present legally sufficient evidence to prove the element of causation. Smith had to prove causation as an element of both her negligence and strict liability claims.[12]

¶48 In ruling on SouthTowne's motion for judgment as a matter of law, the district court concluded that Smith had to prove four facts by a preponderance of the evidence in order to establish causation: that (1) carbon monoxide was actually produced under the hood of her car during the incident in question; (2) once the carbon monoxide was created, it had a pathway into the passenger compartment of Smith's car; (3) once it entered the passenger compartment, the carbon monoxide was sufficiently concentrated to cause Smith harm; and (4) the carbon monoxide actually caused Smith's injury.

¶49 The court found that Smith had provided sufficient evidence of the second and fourth facts it identified. But it

---

[12] To prove negligence, a plaintiff must show (1) a duty existed; (2) breach of that duty; (3) causation, which encompasses both cause-in-fact and proximate cause; and (4) damages. *See Gerbich v. Numed Inc.*, 1999 UT 37, ¶ 14, 977 P.2d 1205; *Raab v. Utah Ry. Co.*, 2009 UT 61, ¶¶ 22–23, 221 P.3d 219. In negligence actions, we employ a "substantial factor" test to determine causation, *see, e.g.*, *Devine v. Cook*, 279 P.2d 1073, 1080 (Utah 1955) (applying the substantial factor test in a negligence case), which rests on the "principle that causation exists when the defendant's conduct is an important or significant contributor to the plaintiff's injuries," *Gardner v. Gardner*, 2019 UT 61, ¶ 23, 452 P.3d 1134 (quoting *Substantial-cause Test*, BLACK'S LAW DICTIONARY, (11th ed. 2019)).

In a strict product liability suit, a plaintiff must prove three elements: "(1) that the product was unreasonably dangerous due to a defect or defective condition, (2) that the defect existed at the time the product was sold, and (3) that the defective condition was a cause of the plaintiff's injuries." *Blank v. Garff Enters. Inc.*, 2021 UT App 6, ¶ 26 n.6, 482 P.3d 258 (citation omitted); *see also* UTAH CODE § 78B-6-703. Liability in these cases rests on the defective product itself, and not on any underlying negligence. *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 45, 232 P.3d 1059.

concluded that no evidence was adduced at trial showing that it was more probable than not that carbon monoxide was actually produced under the hood of Smith's car during her drive to Washington, or that the carbon monoxide was present in her passenger compartment in a sufficient quantity to have caused her injuries.

¶50  With regard to the specific facts identified by the district court as critical to determining causation, it is important to remember that a plaintiff's burden of proof relates to the required elements of each claim, not to individual facts. *See*, *e.g.*, *Orvis v. Johnson*, 2008 UT 2, ¶ 10, 177 P.3d 600 ("Where the moving party would bear the burden of proof at trial, the movant must establish each element of his claim in order to show that he is entitled to judgment as a matter of law."). To be sure, certain facts are "material" in that they are "significant or essential to the issue . . . at hand" and may "make[] a difference in the result to be reached in a given case." *Fact*, BLACK'S LAW DICTIONARY (11th ed. 2019). The role that material facts play in a motion for judgment as a matter of law is the same as in a motion for summary judgment: the moving party must show there were no genuine issues of material fact for the factfinder to weigh and that they are entitled to judgment as a matter of law. *See Nay v. Gen. Motors Corp., GMC Truck Div.*, 850 P.2d 1260, 1264 (Utah 1993) (explaining that "both summary judgment and directed verdicts require that no questions of material fact exist and that the moving party be entitled to judgment as a matter of law").

¶51  A "finding of causation cannot be predicated on mere speculation or conjecture." *Lindsay v. Gibbons & Reed*, 497 P.2d 28, 31 (Utah 1972). For this reason, a plaintiff fails to provide legally sufficient evidence of causation "unless there is evidence from which the inference may reasonably be drawn that the injury suffered was caused by the negligent act of the defendant." *Id*. In other words, evidence of causation is insufficient if it leaves jurors to "speculate as to possibilities." *Id*. Instead, the evidence must allow "reasonable minds" to "make justifiable inferences" based on all the evidence—including direct, circumstantial, and expert evidence—that a defendant's negligence (in a negligence claim) or the defective condition (in a strict liability claim) caused the harm. *Id*.

¶52  We first address the district court's conclusion that Smith failed to prove it was more likely than not that that the leaking diesel fuel produced carbon monoxide when it came in contact

with hot spots in the Volkswagen's engine compartment. The court reasoned that this was "a mixed issue of chemistry and automotive engineering." And it concluded that Smith "failed to call an expert (properly trained in the relevant discipline) to support that diesel fuel *more likely than not* was converted to [carbon monoxide] under the conditions that were present under the hood of her vehicle." Rather, Leiss could testify only that it was possible for this to have happened.

¶53 As a threshold matter, we note that Smith did not have the burden to prove this particular fact by a preponderance of the evidence. *See supra* ¶ 50. But this fact was certainly material to proving causation.

¶54 And we agree with the district court that expert testimony was necessary on this point, because the question of whether diesel fuel leaking onto the Volkswagen's engine compartment could produce carbon monoxide required expertise beyond the knowledge of a layperson. And where jurors cannot, without unjustifiable speculation, resolve a dispute based on the facts of the case and their own experiences, expert testimony is required. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 118, n.217, 372 P.3d 629 (explaining that "expert testimony is generally required to establish complex questions of causation"); *but see Sheppard v. Geneva Rock*, 2021 UT 31, ¶ 31, 493 P.3d 632 (noting, conversely, that expert testimony is "not necessarily required" to prove causation "when the causal connection is readily apparent using only 'common knowledge'" (citation omitted) (internal quotation marks omitted)).

¶55 However, the need for expert testimony in a case neither diminishes the importance of non-expert evidence nor minimizes the jury's role as the factfinder. Rather, expert testimony is meant to supplement the jury's knowledge so that the jury may decide the case without resorting to "mere speculation or conjecture." *Lindsay*, 497 P.2d at 31.

¶56 Expert testimony that fails to take the case out of the realm of speculation or conjecture is insufficient on its own to sustain a plaintiff's burden of proof at trial. *See, e.g.*, *Fox v. Brigham Young Univ.*, 2007 UT App 406, ¶ 23, 176 P.3d 446 (holding that expert testimony was needed "to prevent the fact-finder from resorting to speculation" where the medical factors at issue in the case were "sufficiently complicated to be beyond the ordinary senses and common experience of a layperson").

¶57 But such testimony may nevertheless provide a sufficient basis for a reasonable inference in combination with other evidence in the case. *See, e.g., Okla. Nat. Gas Co. v. Kelly*, 153 P.2d 1010, 1013 (Okla. 1944) (holding that expert testimony that an accident could have caused curvature of the spine, combined with evidence that no curvature of the spine existed prior to—but manifested shortly after—the accident and evidence that "reasonably tended to exclude every other possible cause," was sufficient); *Ketcham v. Thomas*, 283 S.W.2d 642, 649–50 (Mo. 1955) (stating that collision was a "possible" cause of the plaintiff's constant menstrual bleeding, combined with evidence "that immediately after the accident her condition changed to constant bleeding which could not be controlled, and that this constant bleeding was not common and was not a symptom . . . before the collision," was sufficient to survive summary judgment on whether "the accident was the cause of the constant bleeding"); *Ideal Food Prods. Co. v. Rupe*, 261 P.2d 992, 993–94 (Ariz. 1953) (explaining that evidence was sufficient to support damages award where the plaintiff put forward expert testimony that her injury, which was diagnosed after the fall at issue, was "caused by a fall or some injury;" there was "no evidence of a prior trauma or injury that could have been the cause;" and the plaintiff testified "to extreme pain after the accident and that prior to this fall she had never experienced any pain in and about her left hip"); *Rodrigues v. Georgia–Pacific Corp.*, 661 S.E.2d 141, 143–44 (Ga. Ct. App. 2008) (holding that expert testimony "unequivocally stated" that chlorine substantially contributed to the plaintiff's pneumonia but noting that "even if the physician's testimony here were expressed only in terms of the chlorine being a 'possible' cause of [the plaintiff's] injuries, other nonexpert evidence . . . supplemented that testimony . . . [and the plaintiff's] testi[mony] that although he was in apparent good health, he immediately became ill upon his exposure to the chlorine, which continuously worsened into the pneumonia he suffered when he presented at the emergency room" was sufficient to survive summary judgment).

¶58 Such is the case here. Smith identifies several sets of evidence that, taken together, permitted the jury to make a non-speculative finding that the leaking diesel fuel produced carbon monoxide in Smith's engine compartment: (1) the expert testimony of Leiss; (2) the combined testimony of Mejia, the mechanic who worked on Smith's vehicle, Chemical Engineer Schumacher, and Mechanical Engineer Kuehn, (3) Chemical

Engineer Silcox's concession, when confronted with his deposition testimony at trial, that "it's possible" for fuel leaking on an engine to produce carbon monoxide; and (4) Dr. Weaver's differential diagnosis that Smith suffered carbon monoxide poisoning on her trip to Washington. Smith also points to her own first-hand testimony about her drive to Washington and the symptoms she suffered during and after the drive, and the testimony of other fact witnesses who noticed a marked difference in Smith before and after her trip to Washington.

¶59 The district court found that the expert testimony of Leiss established only that it was possible that carbon monoxide could be created in Smith's engine compartment. Smith argues that some of Leiss's testimony was more conclusive than this, but we agree with the district court's view of the evidence as it relates to Leiss's testimony here. Based on a lab test, which monitored the production of carbon monoxide in an enclosed space, Leiss testified that carbon monoxide can be created when diesel fuel hits a surface heated to 344 degrees Fahrenheit. And he testified that parts of the engine—the turbocharger and the exhaust manifold—could reach between 500 and 700 degrees Fahrenheit, and that the turbocharger was in an area of the engine compartment that would not receive a lot of air flow. But because the laboratory test did not replicate the conditions of a vehicle traveling at highway speeds, the court concluded this evidence established only that it was "possible" carbon monoxide was produced in Smith's engine compartment during her drive, but not that it was "actually created." And the court concluded this possibility was insufficient to sustain a finding of causation.

¶60 However, there was additional evidence before the jury that was relevant to whether carbon monoxide was produced in Smith's engine compartment. The jury also heard the recorded testimony of Mejia, who worked on Smith's car after the engine started smoking. Mejia explained that he found large quantities of diesel fuel on various parts of the engine, including near the engine's turbocharger and exhaust manifold—locations that Leiss testified could reach between 500 and 700 degrees Fahrenheit.

¶61 The jury also heard from three of SouthTowne's expert witnesses: Dr. Silcox, Schumacher, and Kuehn. Dr. Silcox testified that carbon monoxide can autogenerate at 469 degrees Fahrenheit in an enclosed space and at 869 degrees Fahrenheit on a flat surface. And on cross-examination, Dr. Silcox—albeit acknowledging his lack of expertise related to automotive

engines—conceded that his deposition testimony had acknowledged the possibility that parts of the engine could reach these temperatures.

¶62 Schumacher testified that he agreed with Dr. Silcox's testimony regarding the temperatures at which diesel fuel can produce carbon monoxide. And he further testified that diesel fuel on a surface heated to a minimum of 600 degrees Fahrenheit can produce carbon monoxide in excess of 300 ppm. Schumacher also testified that the surface of the engine's turbocharger can reach 470 to 480 degrees Fahrenheit.

¶63 Finally, Kuehn testified that after driving a similar model Volkswagen at "full blast" for five minutes, the turbocharger in the car's engine reached 653 degrees Fahrenheit.

¶64 So from SouthTowne's three expert witnesses, the jury heard evidence that carbon monoxide can begin to be produced if diesel fuel contacts a surface heated to 469 degrees Fahrenheit in an enclosed space; that the engine's turbocharger could reach temperatures of 470 to 480 degrees Fahrenheit; that carbon monoxide can be produced at 300 ppm on a 600-plus-degree Fahrenheit surface; and that the turbocharger can reach up to 653 degrees Fahrenheit after five minutes at "full blast" speeds.

¶65 In addition to the aforementioned expert witnesses, the jury also heard from a number of fact witnesses who testified about the circumstances surrounding the alleged carbon monoxide poisoning. For example, Smith testified that she drove the vehicle for approximately five hours while smelling noxious fumes and that upon stopping the vehicle, she observed smoke pouring from the engine compartment. She also testified that during her drive to Washington she exhibited symptoms that, according to her medical expert, were consistent with carbon monoxide poisoning. Additionally, a number of other individuals testified to having observed stark differences in Smith's health and behavior before and after her trip to Washington.

¶66 The jury also heard the expert testimony of Dr. Weaver. Dr. Weaver testified based on objective medical tests, such as an MRI scan of Smith's brain, that Smith had in fact been poisoned by carbon monoxide. And, after eliminating other potential causes and considering all the facts presented to him (including the facts listed above), Dr. Weaver opined that Smith had been poisoned by carbon monoxide while driving her Volkswagen from Utah to Washington in December 2011.

¶67 As part of his testimony, Dr. Weaver explained that smoldering fuel provides a very inefficient form of oxidation, which produces much more carbon monoxide than burning fuel would. He also testified that carbon monoxide poisoning is much more dangerous at higher altitudes because of the lower amounts of oxygen in the air. And he testified, based on Smith's estimated exposure time of five hours, that her injuries could have been caused by a 100-ppm concentration of carbon monoxide, and even less if the duration of exposure had exceeded the estimated five hours.

¶68 When we consider this evidence in total, there was sufficient evidence before the jury to allow it to reasonably infer that the leaked and heated fuel in Smith's engine compartment produced carbon monoxide.[13] In sum, there was evidence that diesel fuel can produce carbon monoxide when heated to 344 or 469 degrees Fahrenheit (depending on the expert) in an enclosed space, and that when heated to either 600 or 869 degrees Fahrenheit (likewise depending on the expert) on a flat surface in an unenclosed space, the fuel will produce carbon monoxide in excess of 300 ppm. Mejia, the mechanic, stated that there was diesel fuel on the turbocharger and exhaust manifold. Leiss testified that these parts of the engine can reach temperatures between 500 and 700 degrees Fahrenheit and that the turbocharger is in an area that receives little airflow. And Kuehn stated that the turbocharger could reach 653 degrees Fahrenheit after five minutes of high-velocity driving. This evidence provides a reasonable basis to conclude that fuel landed on the turbocharger and exhaust manifold and that these parts of the engine were heated to a temperature above 600 degrees Fahrenheit (thus creating conditions that could produce carbon monoxide in excess of 300 ppm).

¶69 Further, this conclusion is supported by other testimony, including that Smith experienced symptoms that are consistent with carbon monoxide poisoning; she observed smoke emanating from her engine compartment once she stopped her car; a medical expert found objective evidence that Smith had suffered carbon

_____

[13] We note that in its response brief, SouthTowne addresses Smith's arguments regarding Leiss's causation testimony but makes no attempt to address the other sets of evidence discussed by Smith.

monoxide poisoning; people who knew Smith testified that her behavior dramatically changed after her trip to Washington; and, after eliminating other potential causes, the medical expert opined that the December 2011 incident was the cause of the carbon monoxide poisoning.

¶70 On this record, there was sufficient evidence before the jury to support a reasonable, non-speculative finding that carbon monoxide was produced in Smith's engine compartment. Accordingly, this issue could not be decided as a matter of law. This was a factual dispute properly left to the jury.[14]

¶71 We next address the district court's conclusion that Smith was required to establish that it was more likely than not that a dose of carbon monoxide sufficient to poison her was present in her passenger compartment and that she failed to do so. As discussed above, Smith was not required to prove this fact by a preponderance of the evidence. Rather, she had the burden of proving the element of causation by a preponderance of the evidence. We agree with the district court that whether Smith was exposed to a harmful level of carbon monoxide was material to proving causation. But as we will explain, she did not necessarily have to prove causation by presenting direct expert testimony quantifying the concentration of carbon monoxide in her car.

¶72 Smith concedes that she did not provide any expert evidence of the carbon monoxide levels inside her passenger compartment during her drive to Washington. But she argues that such evidence is unnecessary based on our decision in *Alder v. Bayer Corp., AGFA Div.*, 2002 UT 115, 61 P.3d 1068. SouthTowne argues that *Alder* does not apply here.

¶73 In that case, we held that to prove causation in toxic tort cases, it is not always necessary for plaintiffs to present expert testimony of the concentration or dosage of the alleged toxin to which they were exposed. *Id.* ¶¶ 79–83. We did not create a blanket rule that such evidence would never be necessary. But we held that where a plaintiff does not present evidence of a toxin's concentration during the time of alleged exposure, other relevant circumstantial evidence can be sufficient to take the fact of

_____

[14] For these reasons, *see infra* ¶¶ 60–69, we disagree with PLAC's argument that "Leiss's opinion . . . was an essential predicate in the chain of causation"—without which the district court "was right to find a failure of proof."

causation out of the realm of speculation. *Id.* ¶¶ 82–83. These principles apply here.

¶74 In *Alder*, medical technicians brought a negligence action against the manufacturer of an x-ray processing machine, alleging that fumes from the machine caused harm. *Id.* ¶¶ 1–2, 19. To satisfy the causation element, the plaintiffs presented medical experts who testified, based on the factual circumstances that had been explained to them and on their diagnosis of the technicians, "that there is a cause[-]and[-]effect connection, all things considered, between [plaintiffs'] exposure in the workplace and [their] symptoms." *Id.* ¶ 8 (citation omitted).

¶75 But because the technicians were "unable to prove exposure to any chemicals, let alone levels known to cause known toxic effects," the district court held that they were "unable to prove causation" and granted summary judgment in the defendant's favor. *Id.* ¶ 67 (citation omitted). We reversed. *Id.* ¶ 83.

¶76 In reversing the district court's decision, we found persuasive a Fifth Circuit opinion stating that "the law does not require plaintiffs to show the precise level of [toxin] to which they were exposed." *Id.* ¶ 76 (referencing *Curtis v. M&S Petrol., Inc.*, 174 F.3d 661 (5th Cir. 1999)). Rather, we explained all that is required is "evidence from which a reasonable person could conclude that a defendant's emission has probably caused a particular plaintiff the kind of harm of which he or she complains before there can be a recovery." *Id.* ¶ 73 (quoting *Wright v. Willamette Indus., Inc.*, 91 F.3d 1105 (8th Cir. 1996)).

¶77 We also explained that

> [i]t is well established that causation "may be proved by circumstantial evidence," . . . and that "[t]he causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." *Id.* ¶ 87 (second and third alterations in original) (quoting *Zuchowicz v. United States*, 140 F.3d 381, 389 (2d Cir. 1998)).

¶78 As an example of the type of circumstantial evidence that can supplement an expert's opinion, we cited a case where causation was established through expert opinion based "on the

temporal relationship between the [alleged breach] and the start of the disease and the differential etiology method of excluding other possible causes." *Alder*, 2002 UT 115, ¶ 86 (quoting *Zuchowicz*, 140 F.3d at 385).

¶79 With these legal principles in mind, we concluded that the technicians had presented sufficient evidence that they were exposed to a harmful dose of chemicals to create a dispute of fact for the jury. Specifically, we noted that the x-ray machine used chemicals known to cause the technicians' symptoms and that the machine "produced an exhaust stream *at least potentially* laced with chemicals." *Alder*, 2002 UT 115, ¶ 70 (emphasis added). And we noted that the technicians' medical experts had testified, after eliminating other potential causes, that there was a reasonable medical probability that the technicians' exposure to the x-ray machine caused the symptoms. *Id.* ¶¶ 8, 71. Based on this evidence, we concluded that the plaintiff technicians had provided sufficient evidence to support their theory of causation, even though they had no direct evidence of the quantity of the chemicals to which they were exposed.[15] *See id.* ¶ 87.

---

[15] In summarizing our decision in *Alder*, we offered a helpful insight to future courts dealing with complicated causation issues, which warrants repetition in full:

> Individuals routinely feel the effects of a wide array of common phenomena whose mechanisms remain unexplained by science, including, for example, the law of gravity, the nature of light, the source of personality, and the process of cell differentiation. If a bicyclist falls and breaks his arm, causation is assumed without argument because of the temporal relationship between the accident and the injury. The law does not object that no one measured the exact magnitude and angle of the forces applied to the bone. Courts do not exclude all testimony regarding the fall because the mechanism of gravity remains undiscovered. Legally, an observable sequence of condition → event → altered condition, has been found sufficient to establish causation even when the exact mechanism is unknown. Therefore, we hold that Technicians enjoy the same opportunity to prove that which they can, as do the victims of more prosaic injuries.

(continued . . .)

¶80 The district court in this case distinguished *Alder* on factual grounds. But the rationale of *Alder* applies here.[16] That case holds that plaintiffs provide sufficient evidence of causation even where they do not have an expert who can quantify their level of toxic exposure, as long as the evidence that was presented provided a reliable basis from which the jury could reasonably infer that the alleged toxin was present and that it harmed the plaintiff. As we explained, because "one who injures another takes him as he is," a "toxic level" of a chemical "becomes any level that is harmful to the[] specific plaintiff[]." *Id.* ¶ 81 (citation omitted).

¶81 Based on the principles articulated in *Alder* and our other causation cases, we conclude the evidence at trial here was sufficient to permit the jury to find without speculation that Smith was exposed to a harmful dose of carbon monoxide during her drive. We first note that Smith did present some evidence of the level at which carbon monoxide generally becomes harmful, and some evidence of the concentration of carbon monoxide produced under her hood. According to Dr. Weaver, exposure to a 100-ppm concentration of carbon monoxide over a five–hour period could have caused Smith's carbon monoxide poisoning. And, as we explained above, the evidence supported a reasonable inference that the smoldering fuel could produce carbon monoxide at a concentration of about 300 ppm. As the district court recognized, Leiss testified that there was a pathway for this carbon monoxide to enter the passenger compartment of the vehicle. While this evidence could not account for certain variables and therefore could not quantify the concentration of carbon monoxide to which Smith was actually exposed in the passenger compartment of the vehicle, it did constitute some evidence of the possible amount of Smith's exposure.

---

*Alder v. Bayer Corp., AGFA Div.*, 2002 UT 115, ¶ 88, 61 P.3d 1068.

[16] PLAC likewise argues that *Alder* is "the exception, not the rule," and that the exception carved out in that case should not apply here. But the overarching principles we articulated in *Alder* remain applicable to these facts. And it is the *totality* of evidence presented in this case—admittedly lacking precise quantification of the dose of carbon monoxide to which Smith was exposed—that supports a non-speculative finding of causation.

¶82 Further, the harmful chemical at issue in this case—carbon monoxide—is "known to cause" the symptoms Smith suffered. And there is ample circumstantial evidence that Smith suffered carbon monoxide poisoning during the drive. Smith testified that she experienced symptoms consistent with carbon monoxide poisoning during and after the drive; she and other fact witnesses testified to a significant change in her behavior immediately after the drive; and Dr. Weaver concluded, based on brain scans (among other things), that Smith had indeed experienced carbon monoxide poisoning.

¶83 Finally, as in *Alder*, in this case a medical expert testified that, after eliminating other potential causes, there was a reasonable medical probability that Smith's carbon monoxide poisoning was caused by the incident in question. *Alder*, 2002 UT 115, ¶ 8.

¶84 This evidence was sufficient to provide the jury with a reasonable basis to find that Smith was exposed to a harmful dose of carbon monoxide during her drive. *See id.* ¶ 80 ("[W]herever chemicals are part of the environment, victims' toxic symptoms are themselves evidence of harmful levels, at least as an issue of triable fact."); *see also id.* ¶ 87 ("[I]t is well established that causation 'may be proved by circumstantial evidence,' . . . and that '[t]he causal relation between an injury and its later physical effects may be established by the direct opinion of a physician, by his deduction by the process of eliminating causes other than the traumatic agency, or by his opinion based upon a hypothetical question." (alterations in original) (quoting *Zuchowicz*, 140 F.3d at 389). Indeed, this evidence was sufficient to permit the jury to find that the carbon monoxide produced by the leaking diesel fuel reached Smith and caused her to suffer carbon monoxide poisoning. And while SouthTowne argues that Leiss's evidence alone was not sufficient to establish this point, it does not address at all the remainder of the relevant evidence presented to the jury.

¶85 Under *Alder*, Smith was not required to prove the level of carbon monoxide to which she was exposed. To prove her theory of causation, Smith needed to adduce evidence that would permit the jury to find, without speculation or guesswork, that she was exposed to enough carbon monoxide to harm her. We conclude that she did so.

¶86 Accordingly, we conclude that Smith presented legally sufficient evidence of causation. And we reverse the grant of judgment as a matter of law to SouthTowne.

*B. Standard of Care*

¶87  On cross appeal, SouthTowne argues that an alternative basis for granting judgment in its favor is that Smith was required to present an expert who could opine on the standard of care applicable to a car dealership handling a vehicle recall, and she failed to do so. The district court rejected this argument, concluding that expert testimony on this issue was unnecessary and that, regardless, this argument was superfluous because "even if the [c]ourt directed a verdict as to negligence, [Smith's strict liability] claim would still stand."

¶88  We agree with the district court. The evidence before the jury, which included testimony from a Volkswagen service manager and a Volkswagen senior manager of product analysis, was sufficient to provide the jury with a reasonable basis to find that SouthTowne acted unreasonably in selling the recalled vehicle to Smith. And even if SouthTowne had prevailed on this argument it would still be liable for Smith's injuries based on strict liability.

¶89  "To determine the relevant standard of care in negligence cases, the essential question is the care that a reasonable person would undertake in the defendant's circumstances." *Gables at Sterling Vill. Homeowners Ass'n, Inc. v. Castlewood-Sterling Vill. I, LLC*, 2018 UT 04, ¶ 57, 417 P.3d 95 (citation omitted) (internal quotation marks omitted). This is generally a question of fact for the jury. *See id*. ("[B]ecause the essential question is the care that a reasonable person would undertake in the defendant's circumstances, we generally leave it to jurors—as ordinary persons representing a particular community—to make that judgment." (citation omitted)). Therefore, in ordinary negligence cases, "we ask a jury of reasonable people to draw upon their collective expertise to conclude how a reasonable person would have acted in [a given] circumstance." *Id.*

¶90  But SouthTowne argues that the complicated procedures involved with a vehicle recall prevented the jury from reliably answering the standard-of-care question here without the aid of expert testimony. We have recognized that, in limited cases, expert testimony may be needed to establish a standard of care. *See id.* ¶ 58 ("Our case law recognizes a limited exception to this general rule."). But those types of cases tend to implicate scientific or technical matters "not within the common knowledge of the lay juror," *id.* ¶ 58 (citation omitted) (internal quotation marks omitted), or require the plaintiff to establish "a particularized and

enhanced duty of care," *id.* ¶ 56 (citation omitted). In other words, expert testimony is required only in cases where the average layperson lacks the technical or scientific knowledge to determine what a reasonable person would have done in the defendant's situation. *See id.* ¶ 59 ("[T]he need for expert testimony turns on the nature of the standard to be addressed by the jury. . . . Where the standard implicates scientific matters beyond the capacity of an ordinary juror . . . expert testimony may be required." (citation omitted)).

¶91   In this case, there was sufficient evidence for the jury to determine how a reasonable person would have acted in response to the vehicle recall. The jury heard the testimony that Volkswagen Corporate issued a recall through a mandatory stop-sale order for a number of listed vehicles. This order prohibited the dealership from selling, leasing, or trading any of the covered vehicles—identified by the vehicle's vehicle identification number (VIN)—until a certain fuel line was replaced. And a Volkswagen service manager testified that a dealership could use the VIN to identify the vehicles on its lot that were subject to the recall. Additionally, a Volkswagen senior officer testified that Smith should not have been sold the vehicle at issue in this case. This is enough evidence for the jury to decide the standard-of-care question in Smith's favor.

¶92   In addressing SouthTowne's argument below, the district court concluded that "there was nothing to indicate that a recall standard of care expert was required" in this case. We agree. SouthTowne has failed to show that the jury needed the help of expert testimony to determine what a reasonable person should have done in response to a mandatory stop-sale order.

¶93   In essence, SouthTowne's argument on this point is that it did not breach a standard of care when it sold the vehicle because, under SouthTowne's interpretation of applicable federal statutes, regulations, and industry safety standards, Volkswagen's stop-sale order did not apply to Smith's vehicle. But whether Volkswagen complied with applicable statutes or regulations is not an ultimate issue in this negligence case.

¶94   It is true, of course, that in some negligence cases a court may adopt a statute or regulation as a standard of care in addition to the typical reasonable-person standard. *See, e.g.*, *Colosimo v. Gateway Cmty. Church*, 2018 UT 26, ¶ 44, 424 P.3d 866 (discussing the circumstances in which it is appropriate to adopt a statute as a standard of care in a negligence case). But the existence of a

relevant statute does not mean that a plaintiff is barred from proving negligence using the default reasonable-person standard. *See generally id.* (discussing plaintiff's negligence claim under the typical reasonable-person standard of care as well as under an alleged statutory standard of care).

¶95  So, notwithstanding the various laws that may have also governed SouthTowne's conduct in this case, the only standard-of-care evidence Smith needed to present was evidence that a reasonable person would not have sold the vehicle to Smith after receiving the mandatory stop-sale order. Smith presented this evidence. And although SouthTowne presented contrary evidence, Smith's evidence provided the jury with a reasonable basis to rule in Smith's favor on this point.

¶96  Accordingly, we conclude that the district court correctly rejected SouthTowne's argument regarding the standard of care. And this does not provide an alternative basis for affirming the order of judgment as a matter of law in its favor.

## II. CONDITIONAL NEW TRIAL ORDER

¶97 Next, the district court conditionally granted SouthTowne a new trial because it concluded that certain testimony from two of Smith's experts—Leiss and Dr. Weaver— should have been excluded, and that without this testimony there was insufficient evidence to support Smith's claims.[17] Smith argues this was error because SouthTowne never made the objections that formed the basis of the court's ruling (therefore waiving them), the district court was wrong on the merits, and she was not given an opportunity to respond to the court's reasons for retroactively excluding the testimony. We find Smith's final argument to be persuasive. And because we reverse the

_____

[17] The trial court analyzed SouthTowne's motion for a new trial under rule 59(a)(6) of the Utah Rules of Civil Procedure, which permits a new trial to be granted for "insufficiency of the evidence to justify the verdict or other decision." (The court identified the applicable rule as 59(a)(5), possibly due to a typographical error.) However, in its motion, SouthTowne argued it was deprived of a fair trial under rule 59(a)(1), which allows a court to grant a new trial based on "irregularity in the proceedings of the court, jury or opposing party, or any order of the court, or abuse of discretion by which a party was prevented from having a fair trial." UTAH R. CIV. P. 59(a)(1).

court's rulings excluding testimony from Leiss and Dr. Weaver on this basis, we must reverse the court's grant of a conditional new trial.

¶98 On cross appeal, SouthTowne argues that the district court should have granted its new trial motion on two other grounds, which the court rejected: (1) that Dr. Weaver should not have been permitted to opine on causation due to alleged reliability defects in his differential diagnosis, and (2) that Dr. Orrison's brain scans and opinions should not have been disclosed to the jury because he was a non-testifying witness and Smith did not make the necessary foundational showing of authenticity or reliability. SouthTowne also argues that in the event of a new trial, we should correct these erroneous rulings. But we conclude the court correctly rejected the arguments SouthTowne advances in its cross appeal. So they do not provide an alternative basis for affirming the grant of a conditional new trial.

¶99 Rule 50 requires a court that has granted a motion for judgment as a matter of law to "also conditionally rule on any motion for a new trial by determining whether a new trial should be granted if the judgment is later vacated or reversed." UTAH R. CIV. P. 50(c)(1). In doing so, "[t]he court must state the grounds for conditionally granting or denying the motion for a new trial" under rule 59. *Id.* A court may grant a new trial if it determines "evidence has been erroneously admitted during the course of a trial." *Franklin v. Stevenson*, 1999 UT 61, ¶ 10, 987 P.2d 22. But "[n]o error in either the admission or the exclusion of evidence . . . is ground for granting a new trial . . . unless refusal to take such action appears to the court inconsistent with substantial justice." UTAH R. CIV. P. 61.

¶100 "Granting a new trial is an extreme remedy." *Boyle v. Christensen*, 2011 UT 20, ¶ 17, 251 P.3d 810. And while we will not disturb a ruling on a motion for a new trial absent an abuse of discretion, we have made clear that "[t]he power of a trial judge to order a new trial is to be used in those rare cases when a jury verdict is manifestly against the weight of the evidence." *Braithwaite v. W. Valley City Corp.*, 921 P.2d 997, 1001 (Utah 1996) (citation omitted). An abuse of discretion exists where "the district court relied on an erroneous conclusion of law," *Northgate Vill. Dev., LC v. City of Orem*, 2019 UT 59, ¶ 27, 450 P.3d 1117 (citation omitted), or "where there is no evidentiary basis for the trial

court's ruling." *Dahl v. Dahl*, 2015 UT 79, ¶ 63, 459 P.3d 276 (citation omitted).

¶101 In its new trial ruling, the district court noted that the "area of most concern" to the court was "the testimony of Mr. Leiss." We therefore begin with Leiss's expert testimony.

*A. Leiss*

¶102 As discussed, at trial Smith offered the opinion testimony of Peter Leiss—an accident reconstruction expert and mechanical engineer with twenty years of experience in the automotive engineering industry, including in quality control for diesel fuel systems. Leiss was called to testify as to whether the diesel fuel spill could have generated carbon monoxide, and if so, whether there was a passageway for the carbon monoxide to travel from the engine compartment into the passenger compartment of Smith's car. The district court held that the latter issue was "well within [Leiss's] bailiwick as an automotive engineer," rendering its resolution a "factual determination for the jury." But the court found fault with Leiss's reliance on the test conducted by the lab technician at Robson Forensics, *see supra* ¶ 18, which the court referred to as the "fish tank test."

¶103 The district court concluded that it had erred in admitting Leiss's testimony "as it relates to the alleged production of [carbon monoxide] based on the fish tank test . . . because it was unreliable and prejudicial" to SouthTowne. In reaching its ruling, the court took particular umbrage at Leiss's reliance on an "unidentified 'lab technician' . . . working at [Leiss's] place of employment" who performed the test. The court also deemed the test inadmissible because Leiss was not a chemist and therefore was not qualified to assess the reliability of the test himself. The court also noted that during his trial testimony, Leiss was unable to answer a number of questions about the testing methods used.

¶104 The court essentially determined that Leiss's reliance on the test did not meet the standards of Utah Rule of Evidence 703, which permits experts to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Under this rule, an expert's opinion may be based on otherwise inadmissible "facts or data" that the expert has been made aware of, provided that "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." UTAH R. EVID. 703. If the proponent of the opinion intends to disclose the underlying "facts or data" to the jury, and the facts or data are otherwise inadmissible (for

example, because they are hearsay), the proponent may do so "only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect." *Id.*

¶105 The district court then concluded that because Leiss's opinion was based on an unreliable test for which he had provided insufficient foundation, his opinion that carbon monoxide could have been produced under Smith's hood was inadmissible under Utah Rule of Evidence 702(b). This rule mandates that any "[s]cientific, technical, or other specialized knowledge" serving as the basis for expert testimony must meet "a threshold showing that the principles or methods . . . underlying . . . the testimony (1) are reliable, (2) are based upon sufficient facts or data, and (3) have been reliably applied to the facts." UTAH R. EVID. 702(b).

¶106 Smith first argues that SouthTowne waived this argument because it did not object to the test for the reasons relied upon by the district court either before or during trial or in its post-trial motions, and that, therefore, the district court's order should be reversed on this basis.

¶107 SouthTowne does not respond to Smith's waiver argument in its appellee brief. And it does not dispute Smith's assertion that it did not raise the particular objections relied upon by the district court.

¶108 Our independent review of the record confirms that SouthTowne did not raise these specific objections to Leiss's testimony. To be clear, in its pre-trial motion *in limine*, SouthTowne did object to Leiss testifying that the leaking diesel fuel created carbon monoxide in Smith's car. But it objected for a different reason. SouthTowne argued not that the laboratory test was unreliable, that the qualifications or identity of the lab technician were unknown, or that, as a non-chemist, Leiss was unqualified to judge whether the test was reliable or whether the technician was qualified. Rather, SouthTowne argued that Leiss should not be allowed to opine about carbon monoxide production in Smith's engine compartment because the test did not replicate the conditions inside the engine compartment of a moving vehicle. In this regard, SouthTowne and its experts took particular issue with the fact that the aquarium test was done in an enclosure and therefore did not account for air flow. In its reply brief in support of its motion *in limine* in the district court, SouthTowne explained:

> The reliability issue with respect to Mr. Leiss concerns the manner in which he proposes to apply his aquarium test to the facts of this case . . . . There are problems with this detection method . . . . Defendants concede, however, that this particular problem with the test goes to weight and will counter it with [expert] testimony . . . . The Rule 702 problem arises from the way in which Mr. Leiss proposes to extrapolate from his aquarium results to conditions under the hood, and inside the passenger compartment, of the Smith vehicle.

¶109 So, in its motion *in limine*, SouthTowne did not challenge the admissibility of the test itself, the qualifications of the lab technician, or Leiss's reliance on the test. In fact, in criticizing one of the methods the lab technician used, SouthTowne recognized this went only to the weight to be given the evidence rather than the admissibility of the test itself.

¶110 SouthTowne also did not object to the admission of the test results during trial. During Leiss's direct examination, Smith offered the laboratory test results as an exhibit. The court asked SouthTowne if it had any objection to the exhibit, to which SouthTowne answered, "No."[18]

¶111 So Smith is correct that SouthTowne did not challenge Leiss's testimony for the reasons relied upon by the district court either before or during trial. And SouthTowne also did not make an argument on this basis in its motion for a new trial.

¶112 Usually, this would be dispositive. *See* UTAH R. EVID. 103(a)(1) (requiring a party to "timely object[] or move[] to strike" evidence it claims was erroneously admitted, and to "state[] the specific ground" upon which the objection was lodged). But here, it is not the end of the analysis. Under civil rule 59(d), a court may grant a motion for a new trial "for a reason not stated" in a party's motion "[a]fter giving the parties notice and an opportunity to be heard." UTAH R. CIV. P. 59(d).

¶113 In scrutinizing Leiss's testimony as it did, the district court was properly observing its role as gatekeeper with respect

_____

[18] This may have been because SouthTowne's experts relied on similar tests, with variations to account for air flow. *See supra* ¶¶ 25–27.

to the admissibility of expert testimony.[19] The court raised concerns with Leiss's reliance on the aquarium test based on its front-row seat at the trial. And rule 59(d) permitted the court to grant a new trial for a reason not raised by SouthTowne in its new trial motion. So SouthTowne's failure to preserve this issue is not dispositive. However, as we will discuss, when a court proceeds under rule 59(d), it must give the non-moving party notice of its concerns and an opportunity to be heard.

---

[19] In its amicus brief, UDLA requests clarification of the proper application of admissibility determinations under rule 702, noting confusion over advisory language in the 2007 amendment. Specifically, UDLA argues that our advisory language "incorrectly downplays the district court's important gatekeeping function," thereby encouraging trial judges to include expert testimony "so long as it can be said that *any* basic indication of reliability exists, no matter how far-fetched." UDLA asks us to "reject any reading of the advisory language that would discourage judges from asserting [their gatekeeping] role."

UDLA accurately notes that our advisory language departs from the federal rule by broadening the scope of "[s]cientific, technical, or other specialized knowledge" on which an expert may rely. *See* UTAH R. EVID. 702 & original advisory committee notes. But this does not suggest that trial judges should abdicate their gatekeeping role. Instead, rule 702 permits judges, as gatekeepers, to err on the side of admission *within the confines of rule 702*. "[T]he rigor of [the rule's application] 'will vary depending on the complexity of the particular case.'" *State v. Roberts*, 2015 UT 24, ¶ 54, 345 P.3d 1226 (quoting *Eskelson ex rel. Eskelson v. Davis Hosp. & Med. Ctr.*, 2010 UT 59, ¶ 15, 242 P.3d 762). Judges are compelled to exclude expert testimony where it is unhelpful, unreliable, unduly prejudicial, or has improperly invaded the province of the jury. *See State v. Martin*, 2017 UT 63, ¶¶ 30–31, 423 P.3d 1254. But judges may not "displace the province of the factfinder to weigh . . . evidence." *State v. Jones*, 2015 UT 19, ¶ 26, 345 P.3d 1195. And although "the line between assessing reliability and weighing evidence can be elusive" under rule 702, "the factfinder [and not arbiter] bears the ultimate responsibility for evaluating the accuracy, reliability, and weight of the testimony." *Id.* (quoting *Gunn Hill Dairy Props., LLC v. L.A. Dep't of Water & Power*, 2012 UT App 20, ¶ 47, 269 P.3d 980).

¶114 Smith next argues that the district court was wrong on the merits. She contends that Leiss did know who performed the lab test and it was reasonable for Leiss to rely on the results of the test. First, Smith proffers Leiss's deposition testimony, in which he identifies the technician conducting the lab test as the "test lab manager, Brett Johnson," and she highlights a portion of Leiss's trial testimony in which he states that the technician does this kind of testing "very often," he is "knowledgeable" and "well versed" in this kind of testing, and experts at Robson Forensics typically rely on the technician. And she argues that she never had the opportunity to offer this response to the district court's concerns.

¶115 We ultimately do not resolve whether the district court's conclusion that it should have excluded this portion of Leiss's testimony was correct. This is because we find Smith's related argument—that she was not given the opportunity to respond to the court's concerns—to be dispositive.

¶116 While rule 59(d) permits a district court to grant a motion for a new trial for a reason not advanced by the moving party, a court may do this only "[a]fter giving the parties notice and an opportunity to be heard."[20] UTAH R. CIV. P. 59(d). *See also Salt Lake Legal Def. Ass'n v. Atherton*, 2011 UT 58, ¶ 12, 267 P.3d 227 (explaining that due process mandates a party "be given notice and an opportunity to be heard" before a judge "adjudicate[s] its interests"). This means that the non-moving party must be given "timely and adequate notice" and an "opportunity to be heard in a meaningful way." *Nelson v. Jacobsen*, 669 P.2d 1207, 1211 (Utah 1983). We have described this as "the very heart of procedural fairness." *Id.*

¶117 Here, Smith was not on notice of the substance of the court's concerns prior to the hearing on SouthTowne's post-trial motions because SouthTowne had not raised these issues in its new trial motion. We recognize that an issue may become apparent to a court during argument on a post-trial motion, and thus make prior notice impossible. In such a situation, a court can

---

[20] We do not explicate upon the issues a court may properly raise sua sponte when granting a motion for a new trial, except to emphasize that it may do so only after giving the parties fair notice and a meaningful opportunity to be heard.

ensure procedural fairness by giving the non-moving party additional time to address the new issue raised by the court.

¶118 In addition to lack of notice, Smith did not have a meaningful opportunity to be heard on the court's objections to the lab test. After the hearing, Smith attempted to submit an affidavit from Leiss to respond to the district court's concerns, but the court rejected the affidavit as an inappropriate attempt to add substantive evidence to the trial record. However, deposition testimony, affidavits, or other pertinent evidence may be admitted as information relevant to the court's legal determination regarding the admissibility of evidence. *See* UTAH R. EVID. 104(a) ("The court must decide any preliminary question about whether a witness is qualified . . . or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."); *see also State v. Sheehan*, 2012 UT App 62, ¶ 28, 273 P.3d 417 ("[T]here are two separate reliability determinations: admissibility, which is a legal determination the court makes, and the weight assigned to the evidence admitted at trial, which is a factual determination made by the fact finder."); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir. 2000) ("It is within the discretion of the trial court to determine *how* to perform its gatekeeping function under *Daubert*. The most common method for fulfilling this function is a *Daubert* hearing, although such a process is not specifically mandated. The district court may also satisfy its gatekeeper role when asked to rule on a motion *in limine*, on an objection during trial, *or on a post-trial motion* so long as the court has sufficient evidence to perform 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" (second emphasis added) (citations omitted)).

¶119 Where a court is considering granting a new trial based on concerns outside those raised by the moving party, rule 59(d) requires the court to ensure that the non-moving party has adequate notice of the new issues and a meaningful opportunity to address them before granting the motion. Because this did not happen here, we reverse the court's new trial ruling excluding the portion of Leiss's testimony that relied on the aquarium test.[21]

---

[21] However, we note that even if this portion of Leiss's testimony were excluded, it would not necessarily render the evidence at trial insufficient to justify the verdict under rule

(continued . . .)

*B. Dr. Weaver*

¶120 Smith next challenges the district court's grant of SouthTowne's new trial motion based on the court's conclusion that it should not have admitted Dr. Weaver's testimony. We reverse this ruling as well, because it is based on an issue SouthTowne did not raise in its new trial motion, and Smith did not have notice of or a meaningful opportunity to respond to the court's concerns with Dr. Weaver's testimony.

¶121 Dr. Weaver opined that Smith had suffered carbon monoxide exposure while driving her Volkswagen to Washington in December 2011. He based this opinion on a review of Smith's medical files, on his experience diagnosing carbon monoxide poisoning, on an in-person evaluation of Smith—which included physical and neurological examinations, an interview about Smith's medical history, and on a battery of written questionnaires and assessments, and on his elimination of other potential causes. The process of identifying the cause of an injury by eliminating other potential causes—a process referred to as a "differential diagnosis"—is generally considered a reliable method supporting expert testimony. *See Alder v. Bayer Corp., AGFA Div.*, 2002 UT 115, ¶ 63, 61 P.3d 1068.

¶122 But although this method is generally accepted, the district court found Dr. Weaver's diagnosis problematic because the court believed Dr. Weaver was unaware of "a second possible source of [carbon monoxide] poisoning"—a period of time in which Smith became homeless and lived in her car. For this reason, the court ruled that SouthTowne's motion for a new trial should be granted because "Dr. Weaver's testimony regarding the *source* of Plaintiff's [carbon monoxide] poisoning was not properly supported by substantial competent evidence."

¶123 Smith argues that SouthTowne waived this objection. She is correct. SouthTowne's argument at trial and in its motion for a new trial was that Dr. Weaver's differential diagnosis was unreliable because Smith had an upper respiratory infection when she drove to Washington, and Dr. Weaver failed to reliably rule

_____

59(a)(6). As discussed above, *see supra* ¶¶ 58–70, the lab test results and Leiss's corresponding testimony were not the only evidence from which the jury could have reasonably inferred that the diesel fuel leaking onto Smith's engine compartment produced carbon monoxide.

out the respiratory infection as the cause of Smith's symptoms. And that is a substantively different argument than the court's concern that Dr. Weaver had not ruled out the period when Smith lived in her car.

¶124 But again, waiver is not dispositive here. *See supra* ¶ 112. The court had the authority under rule 59(d) to grant a new trial for reasons not raised by SouthTowne in its new trial motion.

¶125 Smith also challenges the merits of the court's ruling. She asserts that the court's objection to Dr. Weaver's differential diagnosis was factually incorrect because Dr. Weaver did consider that Smith lived in her car for a period of time and ruled it out as a possible cause of her carbon monoxide poisoning. Smith proffers evidence in support of her argument, and again protests that she was not given the opportunity to respond to the court's concern.

¶126 As with Leiss, we do not resolve this issue on the merits. Rather, we again find dispositive Smith's argument that she did not have an adequate opportunity to be heard on this issue. Because SouthTowne did not raise this issue in its post-trial motion, the court was required to give Smith "notice and an opportunity to be heard" before granting the motion for this reason. *See* UTAH R. CIV. P. 59(d). But since SouthTowne did not ask for a new trial on this basis, Smith did not have notice prior to the hearing that this would be an issue. And although she stated at the hearing that the issue had not been briefed and she was learning of it for the first time, she was not given any additional time to respond to it. Accordingly, we conclude that the requirements of rule 59(d) were not met. And we reverse the court's new trial ruling excluding Dr. Weaver's testimony.

¶127 The court's grant of a new trial was based on its exclusion of testimony from Leiss and Dr. Weaver. Because we have reversed these underlying rulings, we reverse the conditional grant of a new trial in favor of SouthTowne.

*C. SouthTowne's Cross Appeal*

1. Dr. Weaver

¶128 On cross appeal, SouthTowne argues that the district court should have excluded Dr. Weaver's testimony because he failed to reliably apply the methodology of a differential diagnosis to account for Smith's other illnesses and symptoms around the same time she allegedly suffered carbon monoxide poisoning. SouthTowne made this argument in its motion for a new trial, and the district court rejected it.

¶129 Under Utah Rule of Evidence 702(b)(2), a court may exclude expert testimony if that testimony is not based on sufficient facts or data. As such, expert testimony must rest on a reliable foundation. *See Patey v. Lainhart*, 1999 UT 31, ¶ 23, 977 P.2d 1193. Speaking specifically about the foundation necessary to opine on the issue of causation, in *Patey*, we explained that a "declaration about causation is inadmissible 'where an expert witness has not testified to sufficient facts on which to base his opinion.'" *Id.* (citation omitted). In other words, under rule 702, "[t]he expertise of the witness, his degree of familiarity with the necessary facts, and the logical nexus between his opinion and the facts adduced must be established." *Id.* (citation omitted).

¶130 A differential diagnosis is a presumptively admissible diagnostic technique. *See Alder*, 2002 UT 115, ¶¶ 62–64 ("[D]ifferential diagnosis is one of the oldest and most widely used and recognized of all [diagnostic] methods."). And here, Dr. Weaver's expert testimony, "based on accepted and standard methods and techniques" alongside sufficient facts and data to underpin those techniques, does not run afoul of rule 702. *See id.* ¶ 66.

¶131 SouthTowne is correct that simple temporal proximity is insufficient support for a differential diagnosis.[22] *See Taylor v. Univ. of Utah*, 2020 UT 21, ¶ 56, 466 P.3d 124. But as the district court accurately observed, Dr. Weaver considered more than the timing of Smith's alleged exposure and her reported symptoms— including by conducting an extensive review of Smith's medical history and preexisting conditions. The court of appeals has found such testimony admissible under rule 702 where it is based on

---

[22] PLAC also asserts that temporal proximity is an insufficient basis for determining causation. But Dr. Weaver considered information and data that went beyond the temporal connection between Smith's alleged carbon monoxide exposure and the onset of her symptoms when forming his causation opinion. *See supra* ¶ 121. We are not holding that a causation opinion is per se admissible simply because an expert employs a differential diagnosis methodology. That methodology must be grounded in sufficient facts and data. The district court found that this was the case here. And we cannot conclude that it abused its discretion in so holding.

patient statements, temporal proximity, physical examination, and imaging studies. *See Majors v. Owens*, 2015 UT App 306, ¶ 20, 365 P.3d 165. Similarly here, Dr. Weaver relied on Smith's statements and recorded medical history, related imaging studies, the temporal proximity of her alleged carbon monoxide exposure to her constellation of symptoms, and his own physical and neurological examination of Smith to conclude that Smith had suffered carbon monoxide poisoning during her drive to Washington. Based on these facts, we do not disturb the district court's assessment that it "cannot conclude that the manner in which [Dr. Weaver] conducted his differential medical diagnosis was so inappropriate or prejudicial as to require a new trial."

2. Dr. Orrison

¶132 Lastly, on cross appeal, SouthTowne argues that the district court should not have permitted Smith to rely on the scans and related opinions of Dr. Orrison, who ordered an MRI of Smith in November 2013 but was unable to testify at trial because he passed away prior to its start. Specifically, SouthTowne asks us to hold that the district court abused its discretion in (1) failing to apply rule 703's balancing test when it denied SouthTowne's motion *in limine* seeking to exclude Dr. Orrison's scans, and (2) failing to grant SouthTowne a new trial based on the improper introduction of evidence of Dr. Orrison's assessment.

¶133 But the district court's ruling was correct. As SouthTowne notes in its brief, "[a]s a general principle, medical experts often rely on data provided by specialists from other fields, treating providers, or data obtained from imaging scans or diagnostic tests." And, as mentioned, under rule 703, expert opinion may be based on otherwise inadmissible "facts or data" that the expert has been made aware of provided that other "experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject." UTAH. R. EVID. 703. In fact, "[m]uch of what experts rely upon in formulating opinions is inadmissible evidence." *Patey*, 1999 UT 31, ¶ 33; *see also State v. Kelley*, 2000 UT 41, ¶ 23, 1 P.3d 546 (noting that we have held expert testimony based on psychological and medical records not performed by the testifying expert to be admissible). And while rule 703 cannot be used to circumvent other rules of evidence, "experts may recite hearsay evidence in order to lay a foundation for the opinions they give to the jury," *Patey*, 1999 UT 31, ¶ 33, provided the "probative value in helping

the jury evaluate the opinion substantially outweighs [any] prejudicial effect." UTAH R. EVID. 703.

¶134 SouthTowne does not contest that Dr. Orrison was qualified to order and interpret the results of Smith's brain imaging. Nor does it dispute that MRI reports are reasonably relied on by experts in the field as part of the diagnostic process. As the district court aptly pointed out, SouthTowne's own medical expert relied on the records and opinions of other non-testifying experts in this case—including that of Dr. Orrison. And while the "opposing party may challenge the suitability or reliability of such materials on cross-examination, [any] such challenge goes to the weight to be given the testimony, not to its admissibility." *Green v. Louder*, 2001 UT 62, ¶ 28, 29 P.3d 638 (emphasis omitted) (citation omitted).

¶135 Importantly, SouthTowne overstates the extent to which Smith's medical experts relied on the findings of Dr. Orrison. Neither the scans Dr. Orrison ordered, nor his report of the scan findings were entered into evidence. As noted, Dr. Weaver provided medical testimony about the magnitude of Smith's injuries and opined on the cause of those injuries. *See supra* ¶ 121. But although Dr. Weaver based his conclusions in part on the report created by Dr. Orrison, he also interpreted Smith's imaging himself;[23] conducted his own interview with and physical examination of Smith; and, coupled with his extensive personal experience in the field, relied on his knowledge of the events surrounding Smith's alleged carbon monoxide poisoning in forming his opinion.

¶136 The district court found that because "[Dr.] Weaver used the report in forming [his own] opinions regarding [Smith], and because such evidence is the type that is reasonably relied on by experts in the field," any potential prejudice to SouthTowne "was outweighed by the probative value in assisting the jury to evaluate the opinions at issue." We review legal standards applied by the district court for correctness. *State v. Bess*, 2019 UT 70, ¶ 17, 473 P.3d 157. And here, the district court was correct in its application of rule 703 to its admissibility

---

[23] Indeed, in its motion for a new trial, SouthTowne argued that Dr. Weaver lacked sufficient qualifications to opine on Smith's brain imaging. The district court correctly held this argument specious.

determination regarding Dr. Orrison's reports and scans. Accordingly, we affirm the district court's evidentiary rulings with respect to Dr. Orrison.

¶137 In sum, we reverse the underlying bases for the district court's conditional grant of a new trial, and therefore we reverse the district court's conditional new trial order. Further, we affirm the district court's rejection of SouthTowne's alternative arguments for a new trial with respect to Dr. Weaver and Dr. Orrison's scans and opinions. Accordingly, SouthTowne's request that we correct these evidentiary rulings in the event of a new trial is moot. And as we have explained, those arguments would nevertheless fail on the merits.

### III. RULE 60(B) MOTION

¶138 Finally, Smith argues the district court should have dismissed SouthTowne's motion to set aside the judgment under rule 60(b) as untimely. We agree.

¶139 On November 21, 2018—fifty-eight days after the district court entered judgment in favor of Smith—SouthTowne moved for relief from judgment under rules 60(b)(2) and (6) of the Utah Rules of Civil Procedure. Rule 60(b) allows a court to "relieve a party or its legal representative from a judgment, order, or proceeding" for any of the enumerated reasons listed in subsections (1) through (5)—including, under subsection (2), "newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b)"—or for "any other reason that justifies relief" as provided by subsection (6). Utah R. Civ. P. 60(b).

¶140 A rule 60(b) motion "must be filed within a reasonable time," and, if predicated on "one of the reasons [listed] in paragraph (b)(1), (2), or (3), not more than 90 days after entry of the judgment or order . . . ." Utah R. Civ. P. 60(c). Rule 60(b)(2) contains an additional, internal time limit. Under rule 60(b)(2), a district court may set aside a judgement based on newly discovered evidence "*which by due diligence could not have been discovered in time to move for a new trial under [r]ule 59(b).*" Id. 60(b)(2) (emphasis added). Thus, while a motion under 60(b)(2) must be filed "not more than 90 days after entry of the judgment," *id.* 60(c), if the evidence could have been discovered in time to move for a new trial under rule 59(b), the motion is subject to that rule's strict twenty-eight-day time limit. *See id.* 59(b) ("A motion for a new trial must be filed no later than 28 days after entry of the judgment.").

¶141 SouthTowne's rule 60(b) motion asserted that two jurors engaged in misconduct because they allegedly "concealed material bias" against Volkswagen. While SouthTowne largely argued its 60(b) motion under subsection (2)'s "newly discovered evidence" exception to the strict twenty-eight-day deadline of rule 59, it reasoned that, if the court found that "the request does not fall within [r]ule 60(b)(2), then . . . the misconduct would be one of the 'unusual and exceptional circumstances' justifying relief under [the catchall provision of] subparagraph (6)."

¶142 The district court declined to reach the merits of SouthTowne's rule 60(b) motion, concluding that an evidentiary hearing was necessary to "resolve . . . competing [juror] testimony" under the *McDonough* standard,[24] but that such a hearing was unwarranted because the court had already granted SouthTowne a new trial on other grounds. In reaching this conclusion, the court excused the untimeliness of SouthTowne's filing date, noting that while the motion might have been untimely under the rubric of 60(b)(2), "60(b)(6) is not limited or otherwise prescribed by the same timeframe," and SouthTowne had brought the motion pursuant to both subsections.

¶143 But "[r]ule 60(b)(6) is designed to remedy a judgment [only] when exceptional circumstances are present." *Menzies v. Galetka*, 2006 UT 81, ¶ 77, 150 P.3d 480; *see also Kell v. State*, 2012 UT 25, ¶ 18, 285 P.3d 1133 ("Subsection (6) [of rule 60(b)], particularly, should be very cautiously and sparingly invoked by the [c]ourt only in unusual and exceptional circumstances." (second alteration in original) (citation omitted) (internal quotation marks omitted)). And "[a] party may not resort to subsection (6)'s catchall provision when the grounds for relief fall within subsections (1) through (5)," *Carter v. State*, 2015 UT 38, ¶ 17, 345 P.3d 737; *see also Laub v. S. Cent. Utah Tel. Ass'n, Inc.*, 657 P.2d 1304, 1306–07 (Utah 1982) (holding that the residuary clause of rule 60(b) may be employed only if the ground asserted for relief is "one *other* than those listed in [the preceding]

---

[24] In *State v. Thomas*, this court adopted the two-part test articulated by the United States Supreme Court in *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984) to determine when a juror's failure to answer honestly a question on voir dire entitles the defendant to a new trial. 830 P.2d 243, 245 (Utah 1992).

subdivisions"). "Otherwise, a party could use subsection (6) to circumvent the ninety-day time limitation for filing motions grounded in the reasons set forth in subsections (1) through (3)." *Carter*, 2015 UT 38, ¶ 17; *see also Kanzee v. Kanzee*, 668 P.2d 495, 497 (Utah 1983) (holding that, because appellant asserted grounds for relief that were listed in rule 60(b)(1), the appellant was "not entitled to use [the rule's residuary clause] to circumvent the three-month limitation").

¶144 Here, the substance of SouthTowne's motion, alleging juror misconduct based on newly discovered evidence, falls squarely within the ambit of subsection (2). As such, SouthTowne had to satisfy rule 60(b)(2)'s timing requirements.

¶145 SouthTowne argues that we should not rule on Smith's challenge to its rule 60(b) motion because the issue is moot, and "[i]f this court reaches the issue, it should hold that the district court did not abuse its discretion in concluding that SouthTowne's motion was timely, and remand for an evidentiary hearing." But the record shows that SouthTowne had notice of the basis of its allegations before judgment was entered and five months before it filed its rule 60 motion. While we could remand to have the district court consider SouthTowne's motion under rule 60(b)(2), for the sake of judicial economy, we use the record evidence to do so here instead.

¶146 The trial in this case ended on June 20, 2018. One day later, a juror informed one of SouthTowne's paralegals about concerns of misconduct by another juror. On August 27, 2018—sixty-eight days after SouthTowne first heard concerns about potential juror misconduct—the district court entered judgment in favor of Smith, starting the twenty-eight-day clock for new trial motions under rule 59. So from the day SouthTowne first had notice of potential juror misconduct, it had roughly ninety-seven days to investigate and file a motion under rule 59.[25] However,

---

[25] SouthTowne argues that it spent this time attempting to corroborate the reporting juror's statements. But records indicate that by August 18, 2018, after initial attempts failed, SouthTowne ceased efforts to contact the rest of the jury panel. And while SouthTowne finally received corroboration from a second juror on October 4, 2018, SouthTowne did not follow up with the original, reporting juror to get her full statement and declaration until November 14, 2018—a full 40 days later, and nearly five months

(continued . . .)

SouthTowne elected to pursue other avenues of relief from judgment instead. This was a perfectly legitimate choice. But it is insufficient to establish that "by due diligence" the evidence of juror misconduct "could not have been discovered in time to move for a new trial under [r]ule 59(b)." Accordingly, SouthTowne did not meet the requirements of rule 60(b)(2) and was required to raise these allegations by the new trial deadline. Because it did not do so, its rule 60(b) motion must be dismissed as untimely.

## CONCLUSION

¶147 We reverse the district court's grant of judgment as a matter of law to SouthTowne because the cumulative evidence adduced at trial was legally sufficient to satisfy the element of causation. However, we affirm the court's rejection of SouthTowne's argument that it was entitled to judgment as a matter of law because Smith had produced insufficient evidence of the standard of care.

¶148 We also reverse the court's conditional grant of a new trial to SouthTowne because the court's ruling was based on issues that SouthTowne did not raise in its new trial motion, and Smith was not given notice and an opportunity to be heard on the new issues. However, we affirm the court's rejection of SouthTowne's argument that it was entitled to a new trial because of the improper admission of portions of Dr. Weaver's testimony and Dr. Orrison's scans and opinions.

¶149 Finally, we conclude that SouthTowne's rule 60(b) motion must be dismissed as untimely.

¶150 Accordingly, we reverse in part, affirm in part, and order the jury's verdict reinstated.

———————

after the juror had initially expressed concern over potential misconduct.